**NEWS–JOURNAL COMPANY,
Respondent-Appellant,**

v.

**Al CONNELL, Charging Party-Appellee.**

Superior Court of Delaware,
New Castle.

Nov. 6, 1974.

Steven J. Rothschild, of Prickett, Ward, Burt & Sanders, Wilmington, for respondent-appellant.

Leonard L. Williams and George E. Evans, Wilmington, for charging party-appellee.

STIFTEL, President Judge.

The Equal Employment Review Board ruled that the News-Journal Company, respondent-appellant, discriminated against Alfred Connell, appellee, an apprentice

newsman on its staff,[1] with respect to compensation and the terms and conditions of his employment, in violation of 19 Del. C. § 711(a)(1) and (2).[2] The News-Journal has appealed to this Court pursuant to 19 Del.C. § 712(k).

Mr. Connell was first employed by the News-Journal as a part-time lab technician on December 19, 1968. At that time, he had graduated from high school and had attended two colleges but had not received a degree. In December, 1969, Connell became a full-time employee and continued to work primarily as a lab technician. He became an apprentice newsman in June of 1971. At the time this complaint was filed, January 4, 1973, he still worked in that capacity.

Mr. Connell's complaint is two-fold. He claims that he, a Black man, is paid less than two Caucasians on the News-Journal staff, namely, Ms. Jodi Cobb and Mr. John Flanagan,[3] for doing the same kind and quality of work as the aforementioned individuals. Additionally, he asserts that he was assigned to the night shift on the Metro desk, an undesirable assignment.[4] He claims that his treatment resulted from racial discrimination on the part of his supervisor, Charles McGowen. Mr. McGowen, the director of photography, came to the News-Journal in 1971 from Ala-

1. Mr. Connell voluntarily left his employment with News-Journal after this case was heard by the Board. At the time of the hearing, he was employed by News-Journal as an apprentice newsman whose duties consisted chiefly of photography.

2. 19 Del.C. § 711(a)(1) and (2) read as follows:

"(a) It shall be an unlawful employment practice for an employer—
"(1) To fail or refuse to hire or to discharge any individual, or otherwise to dis-

criminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, age, religion, sex, or national origin; or
"(2) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, age, religion, sex, or national origin."

3. The two individuals with whom Connell has been compared in this case, John Flanagan and Jodi Cobb, are both college graduates. Mr. Flanagan earned a Bachelor's Degree in Journalism, with a major in photo journalism, from the University of Missouri School of Journalism in 1971. Ms. Cobb earned a Bachelor's Degree in Journalism from the same institution in 1968. She had also taken special course work in photography and color photography at New York University. Mr. Flanagan became an apprentice newsman on February 7, 1971. Ms. Cobb was hired as an apprentice newsman on September 19, 1971, after serving as a summer intern from June of that year.

|  | Connell | Cobb | Flanagan |
|---|---|---|---|
| February 7, 1971 | $ — | $ — | $140 per wk. |
| May 9, 1971 | — | — | 155 per wk. |
| June 13, 1971 | 150 per wk. | — | 155 per wk. |
| Sept. 19, 1971 | 150 per wk. | 145 per wk. | 155 per wk. |
| November 21, 1971 | 150 per wk. | 152 per wk. | 155 per wk. |
| January 2, 1972 | 150 per wk. | 152 per wk. | 175 per wk. |
| April 30, 1972 | 165 per wk. | 165 per wk. | 175 per wk. |
| October 1, 1972 | 180 per wk. | 185 per wk. | 200 per wk. |
| Sept. 30, 1973 | 191 per wk. | 200 per wk. | 212.50 per wk. |

4. A photographer assigned to the night shift at the Metro desk is dispatched to cover any newsworthy events occurring in the evening. Connell believed this assignment was undesirable due to the hours involved and the fact that promotion would be difficult to achieve from that position. Prior to the filing of this complaint, Connell was taken off the Metro desk.

bama. Connell states that he had no problems in his employment with the News-Journal until McGowen arrived. However, he did mention that McGowen gave him a promotion and three or four pay raises prior to the filing of this complaint.

The News-Journal concedes that Connell is paid less than Flanagan and Cobb. However, it denies that racial discrimination is involved in the treatment of Connell. The News-Journal maintains that Connell's performance, particularly in the area of enterprise photography—the practice of shooting printable newsworthy pictures on one's own free time—which requires considerable initiative and dedication, has been professionally inferior to that of Cobb and Flanagan. Accordingly, it asserts that Mr. Connell may lawfully be paid less than the aforementioned individuals and assigned different duties.[5]

■ The Board determined that the News-Journal's actions were racially motivated. If the record discloses substantial evidence to support the Board's decision, this Court must affirm. Sutton v. Board of Adjustment of the City of Wilmington, 200 A.2d 835 (Del.Super.1962); Malcolm v. Chrysler Corporation, 255 A.2d 706 (Del.Super.1969). Does substantial evidence exist?

Mr. Connell appears to rest his case on two grounds. First, through statistical analysis and witness testimony, he tries to attribute a racially discriminatory attitude to the News-Journal. Secondly, he attempts to demonstrate that his professional competence is equivalent to that of Cobb and Flanagan and that his dissimilar treatment *a fortiori* results from racial discrimination. His failure in each of these efforts will be discussed.

■■ Mr. Connell's statistical analysis [6] is ineffective in establishing a racially discriminating attitude on the part of the News-Journal. Insofar as Mr. Connell is not trying to show that the News-Journal failed to hire him because of his race, the relevance of these statistics is questionable. Moreover, the statistics compare the percentage of Blacks employed by the News-Journal with the percentage of Blacks living in the community. Such a statistical comparison is unreliable as a basis for establishing discrimination, particularly where the job in question involves special skill, education or experience. See, Employment Testing: The Aftermath of Griggs v. Duke Power Co., 72 Colum.L. Rev. 900, 910 (1972); Chance v. Board of Examiners and Board of Education of the City of New York, 330 F.Supp. 203 (S.D. N.Y., 1971). Statistics based on communi-

---

5. 19 Del.C. § 711(f) reads as follows:

"(f) Notwithstanding any other provision of this subchapter it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, age, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of

race, color, religion, age, sex, or national origin."

6. Mr. Connell proffers the following statistics:

"Blacks make up over 40% of the population of the City of Wilmington and 14% of the State. 6.6% of the employees at the News-Journal are Black. The majority of Blacks employed by the Appellant are employed in the lowest category. The lowest class of employees are the service workers of which Blacks are employed at 100%. Blacks make up the following percentages of other areas of employment at the News-Journal: 22% of white collar workers; 10% of the technical workers which include photographers; 8% of the clerical workers; 7% of blue collar workers; 6% of sales; 1% of craftsmen; 1% of managers or officers."

ty racial proportions are ambiguous in that they assume equal interest in the line of work and equal skill to do the work on the part of the general public. See, Developments In the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1154 (1971). For such statistics to establish discrimination, the party proffering them must prove that there exists a significant number of members of the protected group in the community possessing the basic skill to suit the particular position. Dobbins v. Local 212 International Brotherhood of Electrical Workers, 292 F.Supp. 413, 446 (S.D.Ohio 1968). Appellee failed to show a significant number of Blacks in the community possess the skills necessary to qualify for the positions in which the News-Journal has employed few Blacks.

■■ The testimony of witnesses called by Mr. Connell likewise fails to establish racial bias on the part of the News-Journal.

Mr. Robert Houston, a Black photographer who worked for the News-Journal for a short time in 1973, testified that when McGowen interviewed him for a position, McGowen said that he evaluated people on the basis of merit, not race. Houston, cognizant of the fact that McGowen was from Alabama, construed this to mean that McGowen was prejudiced against Blacks. Mr. Michael Sisak testified that the News-Journal at one time expressed a definite desire to *hire* one Robert Cottrell, a Black, in an editorial capacity in the Sports Department. He construed this to mean that the News-Journal evaluates people on the basis of race and thereby possesses a racially discriminatory attitude. He further testified that Hal Bodley, the News-Journal sports editor, made derogatory comments about Mr. Connell's race.

The statement made to Houston by McGowen that he evaluated people on the basis of merit, not race, is not probative of racial bias. The fact that McGowen came from Alabama is of no significance in de-termining his attitude toward Blacks. It should not serve as the basis for twisting a statement, innocent on its face, into a comment reflective of racial bias, particularly where it is undisputed on the record that McGowen gave Connell a promotion and numerous pay raises. Similarly, the instance noted by Sisak wherein the News-Journal expressed a desire to hire a Black photographer should not have been construed by the Board as probative of racial bias on the part of the News-Journal. Indeed, it suggests the antithesis.

Concerning the racially derogatory remarks attributed to Hal Bodley, the Court believes that even if the Board construed these remarks as indicative of racial prejudice on the part of Bodley, they nevertheless cannot be imputed to the News-Journal management, or to Mr. McGowen. See, Board of Education of West Haven v. Commission on Civil Rights, 153 Conn. 652, 220 A.2d 278 (1966). Neither Sisak, nor any of Connell's other witnesses, including Connell himself, could remember any racially derogatory remarks ever made by McGowen, or any member of the News-Journal management team. Hal Bodley played no part in determining Connell's salary and job assignment. Any individual prejudice attributed by the Board to Bodley cannot be considered as the basis of Connell's treatment. There is simply no nexus between Bodley's attitude and the facts upon which this complaint is predicated. Compare, Adolph Coors Co. v. Colorado Civil Rights Commission, 502 P.2d 1113 (Colo.App.1972).

Turning to Mr. Connell's second argument,—that his competence, performance and ability was equal to that of Cobb and Flanagan, and, therefore, his dissimilar treatment results from racial motivation—the record contains no substantial evidence to support that contention.

Mr. Wilson, a former reporter for the News-Journal, called by Connell, admitted he was not qualified to judge the technical proficiency of photographers. Mr. Houston

did not testify on the subject of Connell's competence. Mr. Sisak, who possessed the background to assess photographic proficiency, was familiar with only the sports photos produced by Connell, Cobb and Flanagan. He had no opportunity to view the entire output of these individuals. He admitted he was in no position to judge Connell's competence in the area of enterprise photography—the practice of going out on one's own free time and shooting printable pictures. According to Connell himself, photographers on the News-Journal staff are expected to contribute their share of enterprise photographs. The News-Journal management believed Connell was particularly weak in enterprise photography. Therefore, Sisak was not really in a position to judge Connell's performance and ability in all aspects of news photography. Accordingly, his testimony is not probative of Connell's overall professional competence and value to the News-Journal, in comparison to Cobb and Flanagan.

Other evidence introduced by Connell to demonstrate his competence compared to Cobb and Flanagan consists of certain editions of the News-Journal—i. e., April 2, 1973, April 10, 1973, and April 11, 1973—which reflect that he was, on those days, as productive as Cobb and Flanagan. The Board rightfully remarked that this was not a random sample. The News-Journal usually publishes two papers a day, 6 days a week, 52 weeks a year. Connell's effort on three days out of one year is not an accurate reflection of his productivity or his competence.

McGowen and Keane, the News-Journal picture editor, were in a position to judge Connell's overall competence. It was their duty to do so. They testified that he did not contribute his share of enterprise photography and therefore was not as valuable to the News-Journal as Cobb and Flanagan. None of Connell's witnesses were in a position to contradict this testimony. The News-Journal's evidence concerning Connell's competence in all phases of news photography remains uncontroverted on the record.

Mr. Connell further argued that discrimination by the News-Journal is demonstrated by the fact that Flanagan received a substantial salary increase when he was assigned to Dover, whereas Connell did not receive a comparable increase upon his assignment to the Metro desk. Dover was recognized as an unpopular assignment. The record shows that Flanagan's increase in salary was primarily based upon the difficulty and inconvenience of Flanagan's new assignment.

Substantial probative evidence of racial discrimination by the News-Journal is absent; the decision of the Equal Employment Review Board is reversed.

It is so ordered.