534 F.2d 993
 11 Fair Empl.Prac.Cas. 1450,
11 Empl. Prac. Dec. P 10,633,
12 Empl. Prac. Dec. P 11,091
Boston M. CHANCE, and Louis C. Mercado, individually on
behalf of all others similarly situated,
Plaintiffs-Appellees,
v.
The BOARD OF EXAMINERS AND the BOARD OF EDUCATION OF THE
CITY OF NEW YORK, et al., Defendants-Appellants,
and
Council of Supervisors and Administrators of the City of New
York, Local 1, SASCO, AFL-CIO, Intervenor-Appellant.
 Nos. 1112, 1251, Dockets 75-7161 to 75-7164.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 11, 1975.
Decided Jan. 19, 1976.
On Rehearing May 17, 1976.
 
 Kaye, Scholer, Fierman, Hays & Handler, New York City, for The Board of Examiners.
 W. Bernard Richland, Corp. Counsel, New York City (L. Kevin Sheridan, Leonard Koerner, Leonard Bernikow, New York City, of counsel), for The Board of Education of the City of New York.
 Max H. Frankle, Leonard Greenwald, New York City (Gretchen White Oberman, New York City, of counsel), for Council of Supervisors and Administrators of the City of New York, Local 1, SASCO, AFL-CIO.
 Jack Greenberg, Deborah M. Greenberg, Elizabeth B. DuBois, Jeanne R. Silver, George Cooper, New York City, for plaintiffs-appellees.
 Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Southern District of New York which directed the Board of Education of the City of New York to "excess" supervisory personnel in accordance with a formula imposing racial quotas upon the excessing process. Excessing rules provide in brief that when a position in a school district is eliminated, the least senior person in the job classification used to fill that position shall be transferred, demoted or terminated. It is a system which recognizes the value of pedagogical experience and seniority, and its use is mandated by the New York Education Law[1] and the Collective Bargaining Agreement between the Board of Education and the supervisors' union.[2] We believe that the District Court erred in injecting into this plan a requirement for conformity to a racial quota formula, and we therefore reverse.
 
 
 2
 Fortunately for both reader and writer, we find it unnecessary to recount at length the history of this extended litigation. A summary of the proceedings which now bring the parties to our Court for the fourth time[3] will suffice.
 
 
 3
 This civil rights class action was begun in 1970 for the purpose of correcting an underrepresentation of minorities in supervisory positions in the New York City school system. Employment qualification tests, one of the alleged causes of such disproportion, were thereafter invalidated by the District Court as not job-related; and an interim system of job assignment was created by court order, the details of which are spelled out in our 1974 decision. Because this interim plan provided in part that job assignment would precede licensing and that permanent appointment would follow on-the-job evaluation, it became necessary for the Board of Education to formulate new rules concerning date of appointment for excessing purposes. These rules, which were submitted to the District Court for approval, provided in substance that, in determining seniority for excessing purposes, supervisors would be considered appointed as of the date of their assignment.
 
 
 4
 As Judge Tyler graphically pointed out during one of the many arguments below, this lawsuit has been "like a conflagration that one puts out in one department and then suddenly a new fire breaks out somewhere else." It was not surprising, therefore, that this submission by the Board set new flames burning. Plaintiffs promptly opposed the use of any excessing rules on the ground that minority supervisors recently hired would have the least seniority. This prompted intervention by the Council of Supervisors and Administrators of the City of New York, Local 1, SASCO, AFL-CIO as the representative of all supervisory personnel, including those licensed and appointed prior to the court-ordered interim plan, those licensed and appointed pursuant to such plan and those assigned but not yet appointed. This Union opposed the use of racial quotas and supported the continued use of traditional excessing procedures. Amicus briefs were also filed by the New York City School Boards Association, Inc. whose interest lay in seeing that the powers and prerogatives of the thirty-two school districts within the New York system were not eroded by the court-created excessing plan.
 
 
 5
 Proposals and counterproposals followed closely upon each other until Judge Tyler handed down an order on November 22, 1974, adopting the racial quota concept. This order was amended on February 7, 1975, and it is the amended order which we are reviewing on this appeal. It provides in substance as follows:
 
 
 6
 1. All supervisors are to be divided into three groups: group A Blacks, group B Puerto Ricans and group C Others;
 
 
 7
 2. The percentage of supervisors making up each group is to be computed for each of the thirty-two districts and for the city-wide system;
 
 
 8
 3. Each district may place supervisors from group A or B on its intra-district excessing list only if the percentage of that group on the list does not exceed the percentage of that group in the district;
 
 
 9
 4. Each district may add excessed supervisors from group A or B to the city-wide, inter-district excessing list only if the percentage of that group on the list does not exceed the percentage of that group employed city-wide.
 
 
 10
 Although the order does not specifically so provide, the inevitable consequence of the foregoing provisions is that if racial quotas prevent the excessing of a Black or Puerto Rican, a white person with greater seniority must be excessed in his place.
 
 
 11
 Before the merits of the appeals taken by the Board of Education and the Council of Supervisors can be considered, several preliminary roadblocks raised by plaintiffs must first be removed. Plaintiffs contend that the appeals are not timely. They say that the order of February 7, 1975, merely clarified the order of November 22, 1974, and that therefore appeals should have been taken from the former, not the latter. We find no merit in this contention. Following the issuance of the November 22 order, the Board of Education requested a modification "concerning excessing." A hearing was held, and some modifications were made. We think that the Board's application, addressed sufficiently to the substance of the November order to require a contested rehearing, effectively transferred the mantle of finality from the November to the February order and that appeals from the latter order were therefore timely. Leishman v. Associated Electric Co., 318 U.S. 203, 63 S.Ct. 543, 87 L.Ed. 714 (1943); Sleek v. J. C. Penney Co., 292 F.2d 256 (3d Cir. 1961).
 
 
 12
 Plaintiffs also point out that the order appealed from will be in effect only until November 30, 1977, by which time "it is hoped" the situation regarding minority representation will have changed. Plaintiffs urge that we not concern ourselves, as an appellate court, with this short-term interim relief. In our 1974 decision, at page 825, we expressed concern about the length of time this litigation had remained in an unfinished state and the possibility that "the interim tail" would end up wagging the dog. Another year has passed; the lawsuit has not been terminated, and new orders continue to emerge. Those supervisors who may lose their jobs between now and November 30, 1977, will be little comforted by the knowledge that it was merely a temporary order that put them out of work. Where the basic rights of such innocent non-litigants are so substantially involved, we believe we should, as we have twice before, review what has been done.
 
 
 13
 We thus come to the main question on this appeal, viz.: does a facially neutral excessing plan, which operates on the concept of "last hired-first fired," discriminate against minorities who are disproportionately affected? We agree with the Courts of Appeals for the Third, Fifth and Seventh Circuits that the answer to this question must be "no." See Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309 (7th Cir. 1974), petition for cert. filed, 44 U.S.L.W. 3011 (Apr. 25, 1975); Jersey Central Power and Light Co. v. Local Union, 327, I.B.E.W., 508 F.2d 687 (3d Cir. 1975), petitions for cert. filed, 44 U.S.L.W. 3084 (Aug. 1, 1975), 44 U.S.L.W. 3207 (Sept. 24, 1975); Watkins v. Steel Workers Local No. 2369, 516 F.2d 41 (5th Cir. 1975).
 
 
 14
 Our brothers in the Third and Seventh Circuits have examined the legislative history of Title VII,[4] and they are in accord that this Act was not intended to invalidate bona fide seniority systems. Waters, supra, 502 F.2d at 1318; Jersey Central, supra, 508 F.2d at 710. Our brothers in the Fifth Circuit say that "regardless of what that history may show as to Congressional intent concerning the validity of seniority systems as applied to persons who have themselves suffered from discrimination, there was an express intent to preserve contractual rights of seniority as between whites and persons who had not suffered any effects of discrimination." Watkins, supra, 516 F.2d at 48. All agree, as do we, that the non-remedial distortion of a seniority system through preferential treatment based solely upon race is a form of reverse discrimination specifically proscribed by Congress. Jersey Central, supra, 508 F.2d at 709; Waters, supra, 502 F.2d at 1319; Watkins, supra, 516 F.2d at 46. See also Local 189, United Papermakers v. United States, 416 F.2d 980, 994 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).
 
 
 15
 That plaintiffs herein are proceeding under 42 U.S.C. §§ 1981,1983 does not render defendants' seniority system any more susceptible to attack. Congress has clearly placed its stamp of approval upon seniority systems in 42 U.S.C. § 2000e-2.[5] Whether this section be considered a repeal by implication of any possible contrary construction of § 1981, or simply a statement of guiding legal principles, we agree with the court in Waters that "having passed scrutiny under the substantive requirements of Title VII, the employment seniority system . . . is not violative of 42 U.S.C. § 1981." Waters, supra, 502 F.2d at 1320, n. 4.
 
 
 16
 The relief fashioned by the court below was not designed to benefit only those affected by the employer's prior discriminatory conduct[6] or to insure that the excessing program operated in a non-discriminatory manner. It was intended to insure that there would continue to be a specified quota of Blacks and Puerto Ricans employed in the New York City school system. Our limited approval of the use of racial hiring quotas in such cases as Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), and Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973), is not authority for what the district court has done. We were concerned in those cases with discriminatory hiring practices, and the remedial relief which we approved concerned only hiring procedures. Because there is no claim that defendants' excessing practices are or have been discriminatory, we see no justification for changing them.
 
 
 17
 Moreover, the concern which we expressed in Kirkland v. New York State Department of Correctional Services, 520 F.2d 420 (2d Cir. 1975), about the "bumping" effect of a quota "upon a small number of readily identifiable" individuals finds equal cause for expression in the situation which now confronts us. We are advised that in some of the school districts employees will be excessed from groups containing as few as two or three persons. To require a senior, experienced white member of such a group to stand aside and forego the seniority benefits guaranteed him by the New York Education Law and his union contract, solely because a younger, less experienced member is Black or Puerto Rican is constitutionally forbidden reverse discrimination.[7] Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 209, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (Murphy, J., concurring); Kirkland, supra, 520 F.2d at 429.
 
 
 18
 If a minority worker has been kept from his rightful place on the seniority list by his inability to pass a discriminatory examination, he may, in some instances, be entitled to preferential treatment not because he is Black, but because, and only to the extent that, he has been discriminated against. The "freedom now" and "rightful place" doctrines create constructive or fictional seniority to put minority employees in the approximate spot on the seniority list that they would have occupied had they not been the subject of discrimination. Local 189, United Papermakers v. United States, supra, 416 F.2d at 988. The former contemplates the displacement of white workers where necessary; the latter involves only the filling of vacancies. We have followed the "rightful place" doctrine to the extent of using plant seniority, instead of departmental seniority, where departmental discrimination has prevented or delayed the transfer of minority workers. United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971).[8]
 
 
 19
 There is disagreement among the Circuits as to how far these concepts should be carried in creating fictional dates of employment for minority workers. Cf. Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir. 1974), cert. granted, 419 U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1975), argued November 3, 1975, 44 U.S.L.W. 3273; Meadows v. Ford Motor Company, 510 F.2d 939 (6th Cir. 1975). Upon remand of this case, the District Court may find it unnecessary to await resolution of this dispute by the Supreme Court. The defendant Board of Education has indicated its willingness to accord constructive seniority to any minority supervisor who failed an examination since invalidated as discriminatory by giving him a date of appointment which is the mean appointment date of those who passed the examination. We believe this offer of compromise which appears to be acceptable to the intervening Union should have been adopted by the District Court.
 
 
 20
 A reversal of the order appealed from renders moot the controversy between the Board of Education and the community districts as to whether intra-district as well as inter-district racial quotas should be used and applied in the excessing process. We note that the New York Court of Appeals has specifically held that the Board of Education has the power to establish uniform City-wide excessing rules. Council of Supervisors and Administrators v. Board of Education, 35 N.Y.2d 861, 363 N.Y.S.2d 581, 322 N.E.2d 273 (1974) (mem.). Should the question of excessing authority vis-a-vis the community districts and the Board of Education again arise in this proceeding, we trust that the District Court will defer to the New York State courts' primary concern and expertise in this matter, in so far as it is feasible to do so.
 
 
 21
 Reversed and remanded for further proceedings in accordance with this opinion.
 
 OAKES, Circuit Judge (dissenting):
 
 22
 To my mind the issues are both more simple and more complex than the majority states. They are more simple in that what we are here concerned with is the fashioning of equitable relief under 42 U.S.C. § 1981[1] as a remedy for past racially discriminatory practices. The relief ordered by the district court limits transfers and layoffs of black and Hispanic school supervisors who have only been hired or promoted to their jobs as supervisors since the abolition by court order of racially discriminatory qualifying examinations.[2] This order seems to me to be one properly within the equitable power of the court as a device to protect the integrity of its remedial plan. It is true, however, that the percentage, or "quota," layoff limitation method of the district court was not the only permissible relief which could have been ordered. Were the only class involved that of persons, like the named plaintiff Chance, who were kept from their rightful place on the seniority list by their inability to pass the discriminatory examinations, I would agree with the majority that giving such persons "constructive seniority" effective as of the "mean appointment date" of those who passed the exam which the persons discriminated against had failed might very well be adequate and proper relief.[3] But our case is more complex than this. There is a second class in the litigation before us which is composed of persons who like the named plaintiff Mercado, "have failed to apply for or take such supervisory examinations because they reasonably believed the supervisory examination system to be discriminatory and unrelated to job performance."[4] These people, who comprise by far the largest portion of the plaintiffs in this case,[5] are left wholly unprotected by the "constructive seniority" approach of the majority. Since I believe the district court has discretion to make a reasoned choice among those remedies which are available to effect relief for those who have been injured by the discriminatory exams, and since in the situation before us the use of layoff quotas by the district court was an attempt to do rough justice where perfect equity was not achievable, I must respectfully dissent.
 
 
 23
 This litigation was begun in September of 1970, challenging the examinations used to select principals and other supervisory personnel in the city school system on the basis that the examinations discriminated unconstitutionally against minority groups. It was brought under 42 U.S.C. §§ 1981, 1983, and not under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. But it is interesting to note that Section 703(h) of the latter, 42 U.S.C. § 2000e-2(h),[6] by negative implication makes it an unlawful employment practice "for an employer to give and to act upon the results of" a "professionally developed ability test" where the test itself, its administration or action upon its results is "designed, intended or used to discriminate because of race. . . . " Assuming, as appellees argue, that even though Section 1981 and Title VII are independent, if overlapping, remedies, Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), it is desirable nevertheless that the substantive law relating to what is discrimination be the same under both Section 1981 and Title VII. The provisions of Title VII are by no means inconsistent with, indeed they seem to compel, the original determination in this suit that the supervisory examinations were unconstitutionally discriminatory. Chance v. Board of Education (Chance I), 330 F.Supp. 203, 224 (S.D.N.Y.1971) (preliminary injunctive relief given), aff'd, 458 F.2d 1167 (2d Cir. 1972). Extensive negotiations and additional proceedings in the district court culminated in the entry on July 12, 1973, of a final judgment against the Board of Examiners. This order prohibited the continued implementation of the old discriminatory examination system, mandated the institution of an interim system for filling vacant positions and ordered the development of a permanent new selection system. These orders were again upheld by this court in Chance v. Board of Education (Chance II), 496 F.2d 820 (2d Cir. 1974).
 
 
 24
 Meanwhile, however, the Board of Education had directed community school boards to fill supervisory vacancies in accord with the "transfer list" provisions of the union contract. This resulted in giving priority to those supervisors who had acquired seniority with licenses obtained under the old discriminatory examination system. On December 27, 1973, Judge Mansfield, acting as district judge, held that "the transfer provisions of the (union) agreement, by giving a preference to senior supervisory personnel, violates our Orders." Recognizing that timing in the framing of equitable decrees seeking to remedy past discrimination is of the utmost importance, however, he was then extremely careful to say that
 
 
 25
 This interpretation should not be construed as permanently prohibiting the use of seniority as a basis for selection and appointment of applicants. Following the adoption of a permanent non-discriminatory system for the selection of supervisors in the New York City School System there will undoubtedly come a time when seniority among those selected under such a system can be appropriately recognized. To give preference to those appointed under a discriminatory testing system, however, which is the effect of the (union) agreement's transfer provisions, would be to reward the very discriminatory practices which we have outlawed.
 
 
 26
 No appeal was taken from this order and Judge Tyler, to whom the case was assigned, declined by order of February 25, 1974, to rescind or alter it. The union's appeal from Judge Tyler's February 25, 1974, order was dismissed as not appealable. Chance v. Board of Education (Chance III), 497 F.2d 919 (2d Cir. 1975).
 
 
 27
 In July, 1974, the Board of Education submitted proposed rules to govern "excessing" of supervisors. These would have required that persons whose positions are to be abolished, and those junior to them holding similar or lower positions, be relocated, demoted or terminated, as the case might be, in order of reverse seniority. Appellees opposed the rules on the basis that, like the transfer provisions of the union agreement, the proposed excessing rules would conflict with the remedial purposes of the orders affirmed in Chance II which had held the qualifying exam to be unlawful and had ordered development of a new selection system. After five hearings and assorted submissions Judge Tyler issued an order on November 22, 1974, which, in all material respects, is identical to the order of February 7, 1975, here under appeal. This order permits the use of seniority excessing rules only insofar as the proportion of blacks and Hispanics "excessed" does not exceed the proportion of black and Hispanic supervisors presently employed in each school district and the school system as a whole. His order was made effective retroactively to July 30, 1974, and prospectively until November 30, 1977.
 
 
 28
 On timely application of the Board of Education the order was modified in certain respects not material here on February 7, 1975. This appeal was brought from that order. I should add that I agree with the majority's view that the February order is final and appealable.
 
 
 29
 In evaluating the propriety of Judge Tyler's excessing quota order, it is necessary to consider three separate questions: first, whether the order is unconstitutional; second, whether the order is forbidden by statute under 42 U.S.C. § 2000e-2(h), see note 6 supra ; third, whether, if not prohibited by statutory or constitutional law, the order is within the equitable authority of the trial court. These issues will be discussed in order below.
 
 
 30
 I think the remedial relief afforded was constitutionally allowable for the reasons stated so well by my brother Mansfield, dissenting from the denial of rehearing en banc in Kirkland v. New York State Department of Correctional Services, Nos. 74-2116, 74-2258 (2d Cir. Dec. 10, 1975), slip op. 1003. I need add to his remarks only that it would have been constitutionally permissible, and I think also within the district court's powers, to base "excessing" on some principle other than racial percentage merit, constructive seniority, sharing of the available work or the like. Just as veterans' preferences permissibly reward those for service to their country, given hiring (or firing) preferences favoring those of a minority race (or I would add the female gender) who have been victimized by discrimination until a fair equality of treatment is achieved seem to me to be constitutionally proper. The purpose of the order is to protect, to a limited extent, the black or Hispanic teachers who have recently been made supervisors in retention of their employment, not because they are black or Hispanic but because they have previously been discriminated against by unconstitutional examinations. See Nickel, Preferential Policies in Hiring and Admissions: A Jurisprudential Approach, 75 Colum.L.Rev. 534, 555 (1975). See also Ely, The Constitutionality of Reverse Racial Discrimination, 41 U.Chi.L.Rev. 723, 727 (1974). But cf. Greenawalt, Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions, 75 Colum.L.Rev. 559, 571-73 (1975). On the other side of the scale, the white supervisory personnel disadvantaged by the district court's order would not, it must be presumed from the decisions in Chance I and Chance II, supra, necessarily have gained their preferred place on the seniority ladder were it not for the fact that the qualifying examinations were discriminatory against nonwhites. Thus, they are not in the position, say, of a DeFunis whose superior qualifications are overlooked in favor of less qualified minority students; the white supervisory personnel whose seniority is entrenched by the majority (subject, perhaps, to constructive seniority for the Chance class) have been the very people who have benefited from the school system's prior discriminatory policies. The suggestion that bumping seniors is "constitutionally forbidden reverse discrimination" may find support in dictum in Kirkland v. New York State Department of Correctional Services, 520 F.2d 420, 428-29 (2d Cir. 1975). It may be that it can also find support elsewhere. See, e. g., DeFunis v. Odegaard, 416 U.S. 312, 333, 343-44, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (Douglas, J., dissenting). I find it a little ironic, however, that the Supreme Court authority cited by the majority is Mr. Justice Murphy's concurring opinion in Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 209, 65 S.Ct. 226, 235, 89 L.Ed. 173 (1944), where the Court construed the Railway Labor Act to require a railroad brotherhood to represent all members of the craft union and not to discriminate against a Negro member on account of his race. Justice Murphy's remark that "(t)he Constitution voices its disapproval whenever economic discriminatio n is applied under authority of law against any race, creed or color," id., is merely a statement of the protective nature of the shield provided to minorities by the Fourteenth Amendment it should not be applied out of context as a sword to prevent remedial relief, in the form of affirmative action, for those who have suffered the discrimination which the Amendment condemns. The powers of a court of equity to eliminate the effect of past discrimination are broad, Louisiana v. Black, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), and seem clearly to encompass the affirmative, remedial action ordered here, as recognized in United States v. Montgomery County Board of Education, 395 U.S. 225, 236, 89 S.Ct. 1670, 23 L.Ed.2d 236 (1969), and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). See also Kirkland v. New York State Department of Correctional Services, Nos. 74-2116, 74-2258 (2d Cir. Dec. 10, 1975), slip op. at 1006-10 (Mansfield, J., dissenting from denial of rehearing en banc) (citing cases from our court and seven other circuits).
 
 
 31
 Complaints of reverse discrimination have to be evaluated constitutionally with careful regard to the facts of each case, since any affirmative action to correct past discriminatory practices may result in what seems to be unfairness to those who have benefited by those practices. The complaint of "reverse discrimination" should not be allowed to obscure the need for action to be taken to reverse, or negate, the effects of unlawful discrimination found to exist, as in this case. The focus of our concern should be upon whether there is an accurate method of redressing past discrimination in such a way as to benefit those who have been discriminated against only at the expense, if at all, of those who gained undue advantage by the discrimination. If an accurate method cannot be had, then we may examine whether some rougher form of relief, as for instance a percentage preference, achieves a measure of fair redress at no undue expense.
 
 
 32
 Before reaching these last two questions it is necessary here to respond to the majority's view that Judge Tyler's order was forbidden as a matter of law by Section 703(h) of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(h), note 6 supra. In this regard it may be conceded that the majority appears to be upon firmer ground than in its constitutional argument. The majority relies upon Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309 (7th Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3505 (U.S. Mar. 18, 1975); Jersey Central Power & Light Co. v. Electrical Workers Local 327, 508 F.2d 687 (3d Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3084 (U.S. Aug. 1, 1975), and Watkins v. Steel Workers Local 2369, 516 F.2d 41 (5th Cir. 1975). The Waters and Jersey Central courts have each read the legislative history of Title VII as indicating that layoffs made pursuant to plantwide seniority systems that operate in a facially neutral manner are pursuant to "bona fide" seniority plans and cannot, therefore, constitute unlawful employment practices under Title VII. See 42 U.S.C. § 2000e-2(h); note 6 supra. They reached this result even where the result of the seniority plans was to entrench the effect of prior discrimination against minority workers. See Jersey Central, supra, 508 F.2d at 710; Waters, supra, 502 F.2d at 1317; but see id. at 1320. Other courts and commentators have been more circumspect, however, regarding the fair implications of the legislative history of Title VII. Judge Van Dusen, concurring in Jersey Central only for the purpose of agreeing in the necessity of a remand for further findings, expressly disagreed with the Jersey Central majority's reading of Title VII. He found "persuasive the writers who contend that the legislative history indicates that Congress, in enacting Title VII, did not intend to preclude remedies altering plant seniority which perpetuates discrimination." 508 F.2d at 712 (emphasis added), citing, e. g., Cooper & Sobol, Seniority and Testing Under Fair Employment Law: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1629 (1969); Comment, The Inevitable Interplay of Title VII and the National Labor Relations Act: A New Role for the NLRB, 123 U.Pa.L.Rev. 158, 163-64 (1974). See also Note, Last Hired, First Fired Layoffs and Title VII, 88 Harv.L.Rev. 1544, 1552 (1975) (legislative history of Title VII inconclusive as to scope of protection intended for "bona fide" seniority systems). This reading of Title VII is, in fact, suggested by the plain language of 42 U.S.C. § 2000e-2(h), which does no more than to declare that bona fide seniority systems, cannot, of themselves, constitute an unlawful employment practice. This provision stops far short of stating that where, as in the present case, unlawful employment practices other than bona fide seniority systems have been found to have resulted in discrimination against minority workers, courts may not, in the exercise of their remedial authority alter the effect such seniority plans may have in entrenching the results of the prior discrimination.[7] The courts have already recognized this remedial-subst antive law distinction, at least by necessary implication. Where a facially neutral departmental seniority system has the effect of discriminating, in the layoff situation, against minority employees who have recently transferred into that department as a result of the employer's termination of prior unlawful practices, the courts have all recognized that giving constructive, or "plantwide," seniority as a means of protecting the transferred employees is a proper remedial order. See, e. g., Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975); United States v. Bethlehemtes v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971). Even the courts in Waters, supra, 502 F.2d at 1320, and Jersey Central, supra, 500 F.2d at 705 & n. 48, have acknowledged the propriety of the plantwide seniority remedy to prevent the entrenchment of past departmental discriminations. The third case cited by the majority, Watkins, is consistent, rather than conflicting, with the analysis which suggests that even though bona fide seniority systems are substantively lawful under 42 U.S.C. § 2000e-2(h), they may be disturbed as part of the remedy for other unlawful discriminatory practices. In the Watkins case the Fifth Circuit panel was most cautious in holding that the bona fide seniority system there challenged was only protected "where the individual employees who § uffer layoff under the system have not themselves been the subject of prior employment discrimination." 516 F.2d at 45. It is the absence of an identifiable independent discriminatory practice or substantive law violation, and that alone, which in Watkins, and one might add in Jersey Central as well, forecloses remedial interference with bona fide seniority systems.
 
 
 33
 Our present case is, of course, quite different from the Watkins, Waters and Jersey Central cases. We have before us the history of a discriminatory practice which has resulted in a prolonged failure to hire black and Hispanic supervisors into the New York school system. See note 7 supra. As part of the remedial effort to bring minority supervisor applicants who have suffered past discrimination into the New York schools, and to maintain them there, and as a remedy to offset the loss of unknown years of deserved seniority, I submit that it is permissible to alter the "bona fide" seniority system of the school system even if that seniority system does not itself independently constitute an unlawful employment practice. This conclusion, that remedial authority may require action to be taken which substantive law would not itself independently require, is by no means a novel concept in the jurisprudence of equal protection. See, e. g., Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 17, 31, 91 S.Ct. 1267. In fact, in my view the majority opinion in this case has itself conceded this principle, at least implicitly, by directing the district court to consider the use of "constructive seniority" to afford relief to minority workers in the class of plaintiff Chance. Clearly the grant of such artificial seniority is but a construct for interfering with what the majority insists is a "bona fide" seniority system. That is to say, the majority's continued insistence upon the sanctity of the seniority system which it deems "bona fide" is inconsistent with a willingness to grant remedial interference with that system in the form of "constructive seniority."
 
 
 34
 Having crossed what I believe to be the misconceived hurdle of Title VII, and recognizing the continuing integrity of the remedial powers of the district court, we are still left with the difficult problem whether the particular remedy chosen by the district court is reasonably designed to help those who have suffered from discrimination without unduly harming others. At this level of consideration it is apparent that the district judge faced several choices. He could have followed the approach suggested by the majority, which would grant constructive seniority to those in Chance's class back to the mean appointment date of persons who took and passed the discriminatory exam which persons like Chance took but failed. Were Chance's class the only one involved in this litigation this remedy would appear to represent a sufficient conciliation of the interests of the previously discriminated and previously favored employees. But see note 3 supra. But the present suit involves another (and much larger) class, composed of persons like plaintiff Mercado who never took the discriminatory examinations but who were discouraged from taking them by knowledge of their discriminatory characteristics. The district court could well have considered that it was necessary to give constructive seniority to members of Mercado's class, as well as Chance's. See Note, Last, Hired, First Fired Layoffs and Title VII, supra, 88 Harv.L.Rev. at 1557-60. This seems especially likely in view of the fact that the members of Mercado's class far outnumber those in Chance's class, see note 5 supra, and that a remedy for the latter alone would therefore be quite inadequate for the litigation as a whole. But in many cases it would be difficult, if not impossible, fairly to compute constructive seniority for these persons who were discouraged from ever applying to take the discriminatory examination. The use of a few broad parameters for determining constructive seniority has been suggested in such a case. 88 Harv.L.Rev. at 1559. One approach might be to give members of Mercado's class seniority equal to the average seniority of nonminority workers of the same age. Id. Another possibility would be to assume that persons in Mercado's class were interested in becoming supervisors (which seems likely because they have now applied for these jobs) and would have applied to take a nondiscriminatory exam as soon as they were qualified, in terms of years of service as teachers, to do so. Assuming a person could take the exam after, say, four years of teaching experience, constructive seniority could be given to members of Mercado's class as of the mean appointment date for those who passed the first examination given after the class member had taught for four years. Had the district judge determined that some relief of this type was necessary to afford appropriate relief for the members of Mercado's class, the majority's arguments directed against quotas as such would be inapplicable. While the computation of such constructive seniority would provide only a rough measure of justice among the affected persons, this is a situation where perfect justice seems impossible to attain. A greater objection to the "constructive seniority" approach suggested here is that its administrative difficulties may be substantial, if not overwhelming. If pre-examination requirements include more than merely years of teaching experience,[8] there may be no convenient criteria from which "constructive seniority" for members of Mercado's class could be computed.
 
 
 35
 A third possible remedy, the one chosen by the district court here, avoids the considerable administrative difficulties which may well exist under the constructive seniority method once, as seems necessary to me, the problem of Mercado's class, or persons mentioned in note 3 supra, is considered. Use of a quota for limiting the layoffs of minority supervisors is an easily implemented device which provides substantial protection for both of the discriminated classes in this suit. It is true that the measure of justice afforded by the quota technique may in some instances be considerably rougher than that obtained by the constructive seniority approach.[9] Considering the situation as it lay before the district court, however, with the inability of the interested parties to agree on a fair remedy, with a multiplicity of diverse interests and problems of administering relief as well as difficulties in finely tuning other relief to suit exactly ascertainable equities, I cannot conclude that the quota is so broad and rough a measure of justice that it was beyond the discretion of the trial court. The appellants have forwarded no data suggesting that the quota sweeps in substantial numbers of persons not entitled to relief, and therefore I assume that this effect is not great in this case. And, while the quota technique may also hypothetically operate quite inexactly, it cannot be denied that the constructive seniority approach is rather artificial in its performance too. I cannot, then, conclude that the quota order appealed from was an abuse of the discretion of the district court, at least where as here it is dealing with an interim situation only. Rather, here I believe we should adhere to the guidance of the Supreme Court in International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947), which suggests that "(t)he framing of decrees should take place in the District rather than in Appellate Courts."
 
 
 36
 In summary, I believe that the three important questions before us in this case have been incorrectly decided by the majority. The use of quotas as a remedial limitation on the layoff of minority personnel hired as the result of court-ordered changes in discriminatory employment practices does not violate the Constitution. Nor do such quotas, when they are used as a remedy for past discriminatory practices, violate Section 703(h) of Title VII, 42 U.S.C. § 2000e-2(h). Finally, the quality of the justice obtained by the use of the quota is not so rough that, considering the imperfection of the alternative remedies and the administrative convenience of the quota, the order therefor was an abuse of discretion.
 
 
 37
 I therefore dissent.
 
 ON REHEARING
 PER CURIAM:
 
 38
 Following our original opinion in this case a petition for rehearing and suggestion for hearing en banc was timely filed by the plaintiffs-appellees. While such petition was under consideration by the court, another panel decided Acha v. Beame, 531 F.2d 648 (2d Cir. 1976), and the Supreme Court decided Franks v. Bowman Transportation Co., --- U.S. ----, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356 (1976). Both these cases support the relief of constructive seniority afforded by this court to the plaintiffs in the Chance class, those who took and failed discriminatory supervisory examinations. They also bear on the relief to be afforded to the members of the Mercado class, so-called, those who "have failed to apply for or take such supervisory examinations because they reasonably believed the supervisory examination to be discriminatory and unrelated to job performance." Chance v. Board of Examiners, 70 Civ. 4141 (S.D.N.Y. May 21, 1973) (order of Mansfield, J.), at 7. Accordingly we modify so much of our prior decree as relates to the Mercado class and order that the case be remanded to the district court with directions to accord constructive seniority to the members thereof who have heretofore established or can establish by the usual preponderance of the evidence that they qualify as such.
 
 
 
 [1]
 Section 2585 of the Education Law (McKinney 1970) provides in pertinent part as follows:
 
 
 [2]
 If a board of education abolishes an office or position and creates another office or position for the performance of duties similar to those performed in the office or position abolished, the person filling such office or position at the time of its abolishment shall be appointed to the office or position thus created without reduction in salary or increment, provided the record of such person has been one of faithful, competent service in the office or position he has filled
 
 
 [3]
 Whenever a board of education abolishes a position under this chapter, the services of the teacher having the least seniority in the system within the tenure of the position abolished shall be discontinued
 
 
 [4]
 In a city having a population of one million or more, no member of the teaching or supervising staff who has been regularly appointed in accordance with merit and fitness, determined by competitive examination, shall be dismissed upon the abolishment of his position if:
 a. The superintendent of schools, upon the recommendation of the board of examiners, certifies to the board of education that such member is competent to serve in any vacant position in the same rank or level or in a lower rank or level of service with such board; and
 b. The superintendent of schools, upon direction of the board of education, assigns such member to any such vacant position, in which event such member so assigned shall serve in such position without reduction of salary.
 
 
 [5]
 If an office or position is abolished or if it is consolidated with another position without creating a new position, the person filling such position at the time of its abolishment or consolidation shall be placed upon a preferred eligible list of candidates for appointment to a vacancy that then exists or that may thereafter occur in an office or position similar to the one which such person filled without reduction in salary or increment, provided the record of such person has been one of faithful, competent service in the office or position he has filled. The persons on such preferred list shall be reinstated or appointed to such corresponding or similar positions in the order of their length of service in the system
 
 
 [2]
 The Collective Bargaining Agreement contains a set of detailed excessing rules. In addition, it provides that the "provisions of law" will be followed in all City-wide excessing situations
 
 
 [3]
 See Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Chance v. Board of Examiners, 496 F.2d 820 (2d Cir. 1974). On May 15, 1974, this Court dismissed a third appeal without opinion. Chance v. Board of Examiners, 497 F.2d 919 (2d Cir. 1974)
 
 
 [4]
 42 U.S.C. § 2000e et seq
 
 
 [5]
 42 U.S.C. § 2000e-2(h) provides in pertinent part that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . .."
 
 
 [6]
 Plaintiffs concede that only a small percentage of the minority supervisors appointed since the inception of this litigation failed the examinations found to be discriminatory, and there is no showing as to how many were even eligible to take such examinations
 
 
 [7]
 The discriminatory effects of such conduct would be even more apparent if the senior member were female and thus entitled to the same protection against discharge under § 2000e-2 as a Black. Indeed, if the quota system is proper, the day is not far away when women will seek its assistance in displacing minority workers
 
 
 [8]
 In Bethlehem Steel, we authorized the use of plant seniority only for the purpose of filling vacancies and not to "bump" white workers. We said, at 446 F.2d 661: "Both groups will bid against each other for vacancies on the basis of plant-wide seniority; an earlier hired white employee will have greater seniority than a later-hired black."
 
 
 [1]
 The equitable powers of the district court under 42 U.S.C. § 1981 are at least as great as those under Title VII, § 706(g), 42 U.S.C. § 2000e-5(g), which states in pertinent part:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. . . .
 An example of a court's broad utilization of those powers in connection with a facially neutral departmental seniority plan which froze black employees "into a discriminatory caste" is found in Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1373 (5th Cir. 1974), where the court said: "The principle of the illegality of a facially neutral seniority system superimposed on a history of employment discrimination is so well settled that extended discussion is unnecessary." See generally Note, Last Hired, First Fired Layoffs and Title VII, 88 Harv.L.Rev. 1544 (1975).
 
 
 [2]
 See Chance v. Board of Education, 330 F.Supp. 203 (S.D.N.Y.1971), aff'd, 458 F.2d 1167 (2d Cir. 1972) (preliminary injunctive relief upheld); Chance v. Board of Education, 496 F.2d 820 (2d Cir. 1974) (permanent relief partially afforded)
 
 
 [3]
 Although it would not cover persons who were discouraged from taking the examinations for a period of years because of a reasonable belief that they were discriminatory but who subsequently took the examinations and failed
 
 
 [4]
 Chance v. Board of Examiners, 70 Civ. 4141 (75-7161), May 21, 1973, order of Mansfield, J., at p. 7:
 (1) Finding that all of the conditions precedent prescribed by Rule 23(a) for maintenance of the action as a class suit are met, we grant plaintiffs' motion pursuant to Rule 23(b)(2) for an order allowing it to be so maintained. The class shall include all Blacks and persons of Puerto Rican origin or descent who (1) have failed examinations for supervisory positions in the New York City School System; or (2) have failed to apply for or take such supervisory examinations because they reasonably believed the supervisory examination system to be discriminatory and unrelated to job performance; or (3) have taken such supervisory examinations and have been or are in the process of being evaluated for eligibility lists to be promulgated; or (4) are eligible or will be eligible for supervisory examinations to be given in the future.
 Although Judge Mansfield's order refers to Puerto Rican members of the discriminated class, I have followed the usage of the parties in their briefs and used the term "Hispanic" to refer to these persons.
 
 
 [5]
 Letter dated January 24, 1975, from Jeanne K. Silver, attorney for plaintiffs, to the Honorable Harold R. Tyler, then United States District Judge for the Southern District of New York
 
 
 [6]
 Section 703(h), 42 U.S.C. § 2000e-2(h), provides:
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.
 
 
 [7]
 The opinion in Kirkland v. New York State Department of Correctional Services, 520 F.2d 420, 428 (2d Cir. 1975), pointedly distinguished Chance v. Board of Education, 330 F.Supp. 203 (S.D.N.Y.1971), on the basis that the Chance proof of past discrimination was much clearer. Kirkland, incidentally, also involved "permanent" quotas. 520 F.2d at 428
 
 
 [8]
 Discussion of other prerequisites to the supervisor's examination is shown in Chance v. Board of Examiners, 330 F.Supp. 203, 207 (S.D.N.Y.1971). One such prerequisite is "two years' experience of supervision in day schools under license and appointment, or . . . various alternative experience requirements." Id. Whether the district court could or should factor such considerations into a constructive seniority computation for members of Mercado's class cannot be determined at this appeal. These complications might well, however, weigh severely against use of the constructive seniority, method in this case. Judge Tyler was after all deciding a case involving human, not mathematical, equations
 
 
 [9]
 For example, a minority person who took and failed the discriminatory examination ten years ago may, under the quota system, be laid off before a white or minority supervisor appointed under the nondiscriminatory selection system if the former happened to have been appointed a supervisor after the other two. Also, a black or Hispanic supervisor is protected by the quota and may be laid off only after whites appointed before him have been, even if he passed the discriminatory examinations, or even if he became a supervisor after the discriminatory examinations were outlawed and had never failed or been discouraged from taking them. The majority is quite correct in pointing out that the quota method protects all minority supervisors, even those who were able to overcome the discrimination to achieve their position or who were never discriminated against. While this effect does not make the quota an unconstitutional form of "reverse discrimination," it can be argued to weigh against the reasonableness of the quota as a remedial device for use by the district court